# CONSTRUCTION AGREEMENT

This Construction Agreement ("*Agreement*") made, effective as of the 1st day of November 2018 by and between **SKS Construction**, Inc., a Virginia Corporation, hereinafter referred to "*Contractor*"; and **Walnut Hill Development Corporation**, a Virginia Corporation hereinafter referred to as "*Owner*".

## WITNESSETH:

**WHEREAS,** the Owner owns certain real property, known as Tax Map Parcel 9-34, located in/at King George County, Virginia more particularly described on **Exhibit A** attached hereto (the "*Property*"), and desires to have certain improvements constructed thereon by Contractor, for the development of Walnut Hill subdivision. and

**WHEREAS,** Contractor has reviewed the Plans and Specifications (defined below) for the work and improvements, including the schedule therefor, and Contractor is able to perform all of the Work (defined below) within the requirements of Owner as set forth herein; and

**WHEREAS,** Contractor has agreed to construct such improvements for Owner in accordance with this Agreement, the said parties hereto mutually agree as follows:

1. **Defined Terms**. Capitalized terms shall be defined as set forth herein. In addition to the defined terms set forth in the body of this Agreement, the following terms shall have the meanings set forth below:

*Approved Excusable Delay* - means an Excusable Delay that has been the subject of a Delay Notice and has been approved by the Owner, or otherwise approved under Sections 7.5 and 7.6.

*Business Days* – means any day that is not a Saturday, Sunday or a legal holiday in the Commonwealth of Virginia as set forth in Virginia Code Section 2.2-3000 (1950 as amended). Note: this definition is intended solely for the calculation of schedules, due dates and dates of notice; it is not intended to serve as a restriction on which days the Contractor is expected to perform Work.

*Contract Documents* – means the following documents: (i) this Agreement, (ii) the Plans and Specifications, (iii) the Proposal and Bid Documents, (iv) any agreed upon Change Orders or other amendments and modifications to the Contract Documents, (v) the Proposal Assumptions and Site As-Built conditions, (vi) the Proposal Exclusions, (v) the Schedule of Unit Prices for work outside the defined scope of work.

*Contract Price* – means $731,562.00 subject to adjustment pursuant to any Change Order, amendments, or any reduction in the quantities or services provided pursuant to the Schedule of Values. The Contract Price is a lump sum price.

*County* – means King George County, Virginia.

*Day* or any reference to day or days – means a calendar day unless specifically stated to the contrary.

*Engineer-* means the engineer for the project, previously being Webb & Associates, and currently Legacy Engineering

*Event of Default* – means those events set forth in Section 7 below which constitute a default under the terms of this Agreement by either Owner or Contractor as applicable.

*Excusable Delay* - means a delay in the Contractor's ability to perform the Work that is (i) unforeseeable, and (ii) the delay is not within the control of or caused by an omission or commission of the Contractor, and (iii) the delayed construction activities are critical to the completion of the Work, and (iv) the delay is caused by one of the following: (a) an act or neglect of the Owner or Engineer, or an employee of either, or of a separate contractor employed by the Owner, or (b) changes ordered in the Work by the Owner, or (c) delays authorized by the Owner, or (d) by causes beyond the control of the Contractor such as labor disputes, fire, unusual delays in deliveries, unusually severe weather. The term "unusually severe weather" does not include any and all weather that prevents work under the contract. The phrase means only weather conditions that were abnormal for that period of time, could not have been reasonably anticipated, had an actual adverse effect upon the scheduled construction, and impacted work on a Business Day.

*Final Completion* – means the stage when all Work including but not limited to the Final Punch List Items has been fully performed, and all other actions have been taken so as to require Owner to make the Final Payment.

*Final Punch List Inspections* – means the inspection of the Work by Owner, Owner's Representative, and any and all necessary County, State, or Regulatory personnel required to achieve Final Completion of the Work, including but not necessarily limited to acceptance of the storm water management system, water lines, utility lines and other items intended to be accepted into a system for maintenance by the County or the appropriate governmental or regulatory agency.

*Final Punch List Items* – means those items which the parties agree may be completed by Contractor after the date of Substantial Completion, being those minor items that will not adversely impact the issuance of building permits for the Project such as (i) final top coat of asphalt on roads, (ii) striping on roads, (iii) installation of signs, (iv) final erosion work – to include removal of temporary erosion controls or structures and full re-establishment of disturbed areas with grass acceptable to County, (v) miscellaneous clean up at the site.

*Geotech* – means the soil engineer hired by the Owner that provides all soil engineering services required to perform the Work.

*Geotech Work* - means the work performed by the Geotech on this Project.

*Hazardous Materials* - means any substance, including petroleum products, now or hereafter designated pursuant to Section 307(a) and 311 (b)(2)(A) of the Federal Clean Water Act, 33 USC SSSS 1317(a), 1321(b)(2)(A), Section 112 of the Federal Clean Air Act, 42 USC SS 3412, Section 3001 of the Federal Resource Conservation and Recovery Act, 42 USC SS 6921, Section 7 of the Federal Toxic Substances Control Act, 15 USC SS 2606, or Section 101(14) and Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 USC SSSS 9601(14), 9602.

> ### *Wetlands – JD Approved*
> *Jurisdictional Delineation* – means the jurisdictional delineation of the wetlands on the Property that has been approved by the USACE.

*Legal Requirements* – means all federal, state, local, and regulatory requirements related to the Project including but not necessarily limited to all applicable laws, ordinances and regulations, and terms of all permits and approvals.

*Outside Completion Date* – means the latest possible date for the Contractor to Substantially Complete the Work. The date will be established once revised Construction Plans are prepared and approved by the County. Both parties will agree to a date per the terms of the agreement.

*Owner's Representative* – means Mike Roberts, Director of Land Development, or such other person appointed by the Owner.

*Plans and Specifications* – means the following documents: the site plan entitled "Walnut Hill Subdivision", dated August 10, 2015, last revised August 18, 2016, and approved on April 17, 2017; Revised sheet 11 of 42 (Wildflower Way Plan & Profile) for grade revisions with the same dates previously noted; plans titled "Walnut Hill Booster Pump Station", dated August 12, 2015, last revised September 23, 2016; and previously approved submittal for the permit package associated with the Booster Station; with links of which are noted hereto as **Exhibit F**, and including any amendments and all related documents associated therewith.

*Proposal Assumptions* – means the items set forth on **Exhibit D** attached hereto, which shall include the Soil Conditions Assumptions.

*Proposal Exclusions* – means the items set forth on **Exhibit E** attached hereto.

*Project* – means Walnut Hill Subdivision and Booster Station, with supporting off-site and on-site improvements, as shown on the Plans and Specifications.

*Retainage* – means an amount equal to five percent (5%) of each Payment to be held by Owner (totaling $36,578.10, which amount may be increased or decreased in the event of a Change Order and paid as part of the Final Payment in accordance with the terms of this Agreement. Owner shall pay half of the Retainage in connection with the Final Payment, and the other half of the Retainage upon completion of the Final Punch List Items.

*Rock* - means those natural materials which cannot be excavated in an open excavation with a Caterpillar Model D-8, heavy duty track-type tractor, weighted at not less than 285 hp flywheel power and equipped with a single-shank hydraulic ripper, capable of exerting not less than 45,000 lbs. breakout force, or equivalent machinery. For trenches and pits, rock shall be defined as those materials that cannot be excavated with a Caterpillar Model No. 345 L track-type hydraulic excavator, weighing not less than 99,000 lbs., equipped with a 30-inch wide short-tip radius rock bucket, rated at not less than 345 hp flywheel power with bucket-digging force of not less than 39,000 lbs., or equivalent machinery. Boulders or masses of rock exceeding one-half cubic yard in volume shall also be considered rock excavation. This classification does not include materials such as loose rock, concrete, or other materials that can be removed by means other than drilling and blasting, rock trenching, or hoe-ramming, but which for reasons of economy in excavating, the contractor chooses to remove by drilling and blasting, rock trenching, or hoe-ramming techniques.

*Schedule of Values* – means the schedule attached hereto as **Exhibit C** setting forth specific items of the Work to be performed and the corresponding value associated therewith, the Contract Price shall be adjusted if the Work or items set forth on the Schedule of Values is reduced or modified.

*Soil Conditions Assumptions* - means the assumptions regarding the conditions of the soils on the Property, which are set forth on **Exhibit D**.

*Soil Engineering Reports* - means the following soil studies regarding the Project and Property: N/A

*Substantial Completion/Substantially Complete(d)* – means the stage in progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that Owner can utilize the Work for its intended use, which shall include but not be limited to the Work meeting all Legal Requirements, and allow for the issuance of all building and occupancy permits by the County.

*Substantial Payment* – means the payment to be made by Owner to Contractor pursuant to Section 4.3 below, upon Contractor's completion of the Work required for Substantial Completion.

*Surviving Retainage* – means an amount equal to $18,289.05 that shall be withheld from the Substantial Payment and paid as part of the Final Payment upon Final Completion of the Work.

*Unexcused Delays* – means any delays to the Work that do not qualify as Excusable Delays.

---

**_Wetlands – JD Approved & Wetlands Permit - IN PROGRESS_**

*Wetlands* – means any area that meets the definition of "waters of the United States" under 40 CFR 230.3(s) or "wetlands" under 40 CFR 230.3(t).

*Wetlands Permits* – means collectively, the permits to be issued by the US Army Corps of Engineers ("**_USACE_**" and the Virginia Department of Environmental Quality ("**_DEQ_**") for the disturbance and impact of waters of the US and wetlands. The Owner is responsible for obtaining the required permits from USACE and DEQ.

---

*Work* – means all work shown in the Contract Documents for the completion of the Project, generally described as the clearing, site grading, pad grading and compaction, installation of erosion and sediment control, maintenance of erosion and sediment control (which shall continue until Final Payment), sanitary sewer installation, water main installation, storm sewer installation, installation and construction of signage, road paving, installation of tie-ins, water and sewer testing, surveying, stake-out, creation of "As Built" plans, Work, and all other items called for in the Plans and Specifications, or by the terms of this Agreement. The Work shall also include any such items agreed to be performed by Contractor and paid for by Owner pursuant to a Change Order.

*Work Schedule* – means that certain schedule set forth on **Exhibit G** attached hereto and incorporated herein by this reference, which sets the duration of the Work.

2. **Scope of Work and Description of Project**

2.1    Work Generally. Contractor will perform all Work as shown on the Plans and Specifications, this Agreement, and the Contract Documents for the completion of the Project in a quality and workmanlike manner. All of the Work shall be done in strict compliance with this Agreement, the Plans and Specifications and any written Change Orders and amendments agreed to by the parties as set forth herein. Contractor shall supervise, coordinate and schedule all Work, including but not limited to site activities, including those of suppliers, subcontractors and all special trades required to complete the Project in strict compliance with the Plans and Specifications, this Agreement, the Contract Documents and any applicable laws, rules, regulations, codes and ordinances. The Contractor shall use all new materials on the Project and Contractor warrants to the Owner that, for a period of one (1) year from date of Final Inspections, the materials and labor supplied by Contractor will be free from defects and the Project will be constructed in a quality and workmanlike manner.

2.2 Exclusions. It is intended by the parties that all of the work shown in the Proposal and Bid Documents and Plans and Specifications shall be performed by the Contractor, except for the agreed upon Proposal Exclusions that are set forth in **Exhibit E**. The items that are shown on the Proposal and Bid Documents and Plans and Specifications, but that the parties intend to exclude from the Work are identified on **Exhibit E** as "Project Specific Exclusions." The items identified on **Exhibit E** under "General Exclusions" are intended to cover circumstances that may arise but are not specifically addressed by the Proposal and Bid Documents and Plans and Specifications. In case of a conflict between the Proposal and Bid Documents and Plans and Specifications and **Exhibit E**, then (i) the terms of Project Specific Exclusions shall govern over the Proposal and Bid Documents and Plans and Specifications, and (ii) the terms of the Proposal and Bid Documents and Plans and Specifications shall govern over the General Exclusions. For clarification, see the examples shown in **Exhibit E**.

2.3    Specific Work Items. Notwithstanding anything to the contrary set forth herein, the following items of Work shall be completed upon the terms set forth below.

2.3.1    Roads and Pads. Owner will retain, at its cost, the Geotech to consult and oversee certain facets of the Work relating to the construction and installation of the roads, and pad sites. Contractor shall be responsible for scheduling all Geotech testing and site visits; however, Owner has the right to require approval of all scheduling of Geotech.

2.3.2    Site Balance. The parties agree to work together in good faith to determine a logical place on the site to place any excess materials and review responsible solutions for balancing the job.

2.3.3    Erosion Control. Upon the execution of this Agreement and extending through the date of Final Payment, Contractor shall be responsible for all aspects of erosion control relating to the Contractor's work on the Project, including the maintenance, repair, clean-up, replacement, removal and other such items of work necessary to construct and maintain the retention ponds, and other such facets of the Project relating to erosion control. Notwithstanding anything to the contrary contained herein, in the event any aspect of the Project relating to erosion control is damaged by the acts of Owner, Owner shall pay Contractor a reasonable price to be agreed upon by the parties in good faith to repair such damage. Nothing contained herein shall be deemed to modify, reduce, or mitigate the responsibilities or obligations of Contractor pursuant to any warranty of the Work provided by Contractor hereunder.

2.4    Schedule. Contractor shall use its best efforts to complete the Work in a timely fashion, as set forth more particularly in the Work Schedule **Exhibit G**). If, at any time, the Contractor is behind schedule due to Unexcused Delays, the Contractor shall, at no cost to Owner, accelerate its construction efforts to make up for the Unexcused Delays. Contractor and Owner agree that the Work shall be Substantially Completed by no later than the Outside Completion Date. The Outside Completion Date shall be extended by the number of days of Approved Excusable Delays. In the event that Contractor fails to

Substantially Complete the Work by the Outside Completion Date applicable to each Phase, Contractor shall pay a delay fee to Owner equal to $200 for each day after the Outside Completion Date during which the Work is not Substantially Complete (the "***Delay Fee***"). The Delay Fee may be either (i) deducted from the Final Payment paid by Owner to Contractor, or (ii) in the event the Delay Fee exceeds the amount of the Final Payment, paid by Contractor to Owner within ten (10) days from written demand for the same. In the event of any Excusable Delay, or any other matter or occurrence which causes a delay in the Work to be performed by Contractor which Contractor believes should qualify as an Excusable Delay and result in an extension of the Outside Completion Date, Contractor shall submit a schedule listing the number of days delayed and the cause of such delay to Owner along with the next Invoice to be submitted to Contractor (the "***Delay Notice***"). The Outside Completion Date may only be extended (at no penalty to Contractor) if Contractor submits such a Delay Notice, which is approved by Owner. If Contractor fails to submit a Delay Notice as aforesaid, Contractor shall be deemed to have waived any opportunity to claim such delays as a reason to extend the Outside Completion Date. Upon receipt of the Delay Notice, Owner may either (i) agree to the provisions of the Delay Notice at which point the delays shall be Approved Excusable Delays and the date of Substantial Completion shall be deemed extended in accordance with the Delay Notice, or (ii) disagree with the Delay Notice in writing at which point the delays shall be Unexcused Delays and the date of Substantial Completion shall not be deemed to be extended. If Owner fails to provide a written notice of its disagreement with the Delay Notice within ten (10) days from delivery of the Delay Notice than owner shall be deemed to have agreed with the Delay Notice, the delays shall be treated as Excusable Delays and the Outside Completion Date shall be extended. In the event that Owner disagrees with the Delay Notice, the parties shall work together in good faith to resolve the dispute and shall set forth their agreement in writing. In the event the parties cannot resolve the dispute the provisions of Sections 7.5 and 7.6 shall govern the rights, obligations and duties of the parties. The Contractor shall have no right to claim early completion delay damages.

    2.5    Change Orders. No change in the Work, whether requested by the Owner or proposed by the Contractor, whether an alteration or an addition to the Work, shall form the basis of an addition to the Contract Price or to any amounts due under the Contract Documents or to a change to the date of Substantial Completion unless and until such alteration or addition has been authorized by a written Change Order executed and issued in strict compliance with the requirements of this Contract or by written authorization to proceed with such Owner-recognized change in the Work signed by the Owner. Owner shall designate a responsible person to authorize the performance of change order work prior to Contractor's commencement of work, which by default will be the same as the Owner's Representative identified previously.

        2.5.1    By Owner. Contractor will perform all extra or additional Work desired by Owner promptly upon Owner's written order therefor in each instance for the cost amount to be mutually agreed upon between Owner and Contractor in a written Change Order. Owner shall not be obligated to pay for and Contractor shall not be obligated to perform any extra Work or change in the Work unless the

parties have executed a written Change Order therefor. Any such Change Order must contain a written agreement setting out on the face of the Change Order (i) a description of the additional Work to be performed, (ii) the amount to be paid for the additional Work, (iii) if the additional Work will create any delay, the amended date of Substantial Completion agreed to by the parties, and (iv) signatures of Owner and Contractor. The Contractor shall not accept or be authorized to accept any request for a Change Order nor any approval for a Change Order from anyone other than the Owner. If any change in the Work by Owner affects a decrease in the Work, the Contract Price shall be reduced by an amount equal to the actual costs of the Work attributable to the deleted items. If a dispute arises out of or is based upon the cost or value of the Work involved in a proposed Change Order, Contractor nevertheless shall promptly comply with Owner's written order for such change in the Work and promptly commence the same, subject to the later determination of such cost or value.

2.5.2    By Contractor. Contractor may change the scope of Work only in the event that the Proposal Assumptions set forth on **Exhibit D** attached hereto are proven false. In the event that any such Assumption is proven false, Contractor may change the scope of Work by providing a Change Order request to Owner setting forth the basis for such request and including the proposed form of a Change Order to be executed by the parties. In the event that Contractor requests a Change Order pursuant to this provision of this Section 2.5.2, and such Change Order results in an increase in the Contract Price, the parties agree that such increase in the Contract Price shall not exceed the actual cost of the additional Work to be performed pursuant to the Change Order plus ten percent (10%). Owner shall have a reasonable amount of time to respond to the request. In the event that Owner does not agree to the terms of the Proposed Change Order the parties shall negotiate the terms in good faith, and the date of Substantial Completion shall be delayed by a corresponding number of days. In the event that the parties cannot agree upon the terms of the proposed Change Order within ten (10) days then Owner at its option may terminate this Agreement, and Contractor shall be paid for the Work performed as of the date of such termination.

2.6    Final Punch List Item Work. The Final Punch List Items shall be performed after the date of Substantial Completion. The Work associated with the Final Punch List Items shall be completed by Contractor within sixty (60) days from the date on which Owner provides notice to Contractor that Contractor may begin the Final Punch List Item Work. The Final Punch List Item Work shall be subject to the same requirements, representations and warranties as the rest of the Work. Payment for the Final Punch List Item Work shall be made in accordance with the Schedule of Values, and the subject to the provisions of Section 4 below, including but not limited to the preconditions of payment set forth in Section 4.7.

2.7    Miscellaneous Work. Contractor agrees that the following items shall be performed as a part of the Work:

    i.  (a) the top of all crocks, and (b) all yokes shall be adjusted to County standards and specifications and to a level that Owner may install the individual water and sewer lines for each lot which is a part of the Project without the need for significant modifications to said lines or the aforesaid crocks and yokes and shall be easily identifiable and reasonably protected;

    ii.  immediately prior to Substantial Completion, or as otherwise requested by Owner or required by the applicable authorities, Contractor shall provide an as-built survey reviewed and certified by a qualified engineer, meeting all requirements of the County;

    iii.  Contractor shall ensure that the pads being constructed for Lots, ditches, and common areas drain properly in accordance with the Plans and Specifications (as applicable), the Legal Requirements, and generally accepted commercial practices; and

    iv.  Contractor shall seed and germinate the Project to ensure that grass grows in accordance with the Plans and Specifications in an aesthetically pleasing manner consistent with best industry practices, and suitable for release of any outstanding bonds that the Owner may have with the County. The grass shall have a survival rate of at least eighty-five percent (85%), or such higher survival rate as required by the County.

**3.**  **Contract Price**

  3.1  Owner agrees to pay Contractor, for the Work described, the Contract Price.

  3.2  The Contract Price is based upon the Schedule of Values attached hereto as **Exhibit C** (the "*Schedule of Values*"). The Contract Price shall be adjusted in accordance with any duly executed Change Orders, or in the event that the Work or items set forth on the Schedule of Values is reduced or modified to lessen the expense of the applicable Work or item set forth thereon. For the avoidance of doubt, the Contract Price may only be increased pursuant to a Change Order, or an amendment to this Agreement. However, the Contract Price shall be lowered based on the Work performed or the reduction in the quantity of the items used from the description set forth on the Schedule of Values.

  3.3  Payment for the Final Punch List Items shall be made in accordance with the Schedule of Values and in accordance with the provisions of section 4 below. Notwithstanding anything to the contrary in this Agreement, the Substantial Payment shall not include the payment for the Final Punch List Items, nor shall it include the Retainage held by Owner, which shall be paid upon Final Completion.

**4.**  **Payments to Contractor**

4.1    Contractor shall, by no later than the 25th day of each month after the commencement of the Work, submit sworn monthly progress requisitions ("***Invoice(s)***") to the Owner for monthly progress payment (a "***Payment***"). Owner shall make such monthly progress payments to Contractor on account of the Contract Price, as provided herein, on or before the later of (i) the 25th day of the following month, or (ii) within ten (10) days of the satisfaction of the Payment Preconditions set forth in Section 4.7 being met.

4.2    Each Invoice shall be based upon the Schedule of Values attached hereto as **Exhibit C**, allocating the Contract Price among the various portions of the Work, and shall certify the percentage of completion of each portion of the Work as of the end of the period covered by each such application. Subject to the provisions of the Contract Documents, each progress payment shall be computed as follows:

4.2.1    Take that portion of the Contract Price properly allocable to completed Work (as agreed by Contractor and Owner ) determined by multiplying the percentage completion of each portion of the Work by the share of the total Contract Sum allocated by the Schedule of Values. Contractor acknowledges that five percent (5%) of each Payment due shall be held as retainage and will be paid when the County issues agreement of final site conditions (entrance, roadways, ditches, utilities, stabilization, etc.) and all close-out documents (warranty letters or certificates, as-builts, etc.,) have been received by Owner.

4.2.2    Add amounts properly allocable for completed Work (as agreed by Contractor and as Owner) under any duly approved Change Orders, determined by multiplying the percentage completion of each portion of the Work set forth in the Change Order by the share of the total cost of the Work set forth in the Change Order. Contractor acknowledges that any amounts payable pursuant to a written Change Order shall be subject to ten percent (10%) Retainage, which Retainage part of which shall be paid as part of the Final Payment (defined below), and the remainder of which shall be paid upon completion of the Final Punch List Items.

4.2.3    Subtract the aggregate of previous Payments made by Owner.

4.2.4    Subtract amounts, if any, for which Owner has nullified a certificate of payment or which Owner is entitled to withhold or offset pursuant to other provisions of this Agreement.

4.2.5    Subtract the five percent (5%) retainage amount from the Payment, to be retained by Owner and paid pursuant to Section 4.3 below.

4.3    The "***Substantial Payment***", constituting the entire unpaid balance of the Contract Price for Work performed as of the date of Substantial Completion less the Surviving Retainage, being an amount equal to $713,272.95, shall be paid by the Owner to the Contractor in accordance with Section 4.1 after satisfaction of all the following:

(i)    The Contractor has satisfied all requirements for Substantial Payment contained in the Contract Documents;

(ii)    Final lien waivers have been obtained from Contractor, subcontractors and suppliers for all Work performed as of the date of Substantial Completion;

(iii)    All required permits for the Work performed as of the date of Substantial Completion have been issued and closed out by appropriate authorities, and Owner has received all required inspections, test reports and certifications (including compliance with all Legal Requirements) from the appropriate authorities unless due solely to the action or inaction of Owner;

(iv)    All of Contractor's Work necessary for the release of any of Owner's county, city, municipal or state bonds related to the Work performed as of the date of Substantial Completion has been completed and the bonds have actually been released; and

(v)    Contractor has provided Owner with marked-up plans indicating all field changes; all warranties and guarantees for all Work; and

(vi)    The Contractor has fully performed in accordance with the Contract Documents, except for the Contractor's responsibility to satisfy any requirements that necessarily survive Substantial Payment and completion of the Final Punch List Items which shall be handled pursuant to Sections 2.5 and 3.3 above.

(vii)    The Substantial Payment shall not include such amounts which will be paid for Work performed in connection with the Final Punch List Items. Notwithstanding anything to the contrary contained herein, Owner shall retain the Surviving Retainage until the Work associated with the Final Punch List Items has been performed and invoiced, in accordance with the terms of Section 4.

4.4    The "*Final Payment*" constituting the entire unpaid balance of the Contract Price for Work performed as of the date of Final Completion, including the Surviving Retainage, and any Retainage held for Work constituting the Final Punch List Items shall be paid by the Owner to the Contractor in accordance with Section 4.1 after satisfaction of all the following:

(i)    The Contractor has satisfied all requirements for Final Payment contained in the Contract Documents;

(ii)    Final lien waivers have been obtained from Contractor, subcontractors and suppliers for all Work;

(iii)    All required permits have been issued and closed out by appropriate authorities, and Owner has passed and received certification of the Final Inspections, test reports and certifications (including compliance with all Legal Requirements) from the appropriate authorities unless due solely to the action or inaction of Owner;

(iv)    All Work necessary for the release of any of Owner's county, city, municipal or state bonds related to the Work has been completed and the bonds have actually been released; and

(v)    Contractor has provided Owner with marked-up plans indicating all field changes; all warranties and guarantees for all Work; and

(vi)    The Contractor has fully performed in accordance with the Contract Documents, except for the Contractor's responsibility to satisfy any requirements that necessarily survive Final Payment.

4.5    By submitting an Invoice to Owner hereunder in each instance (whether partial or final), Contractor shall be deemed to be representing to Owner that Contractor shall pay all subcontractors, suppliers and other persons for work, labor, materials and equipment covered by and included in such Invoice.

4.6    <u>Preconditions to Payment</u>. Notwithstanding anything to the contrary contained herein, Owner's obligation to make a Payment to Contractor in accordance with the terms of this Section 4 shall be conditioned on the following:

i.    For any Work to be inspected by Geotech (for example, roads, utility backfills, pad sites), Geotech shall provide a certification that all such Work has been completed per the Plans and Specifications, in a workmanlike and quality manner, and meets the standards set forth by the County, or other regulatory agencies;

ii.    Upon the submission of any Invoice, Owner shall have five (5) Business Days to inspect the Work which is the subject of said Invoice, and object in writing if Owner disagrees with the stated percentage of Work completed set forth in said Invoice, in the event that Owner so objects, Owner shall make Payment for the Work that Owner agrees has been completed, and Owner and Contractor shall work together in good faith to resolve the dispute, if the dispute cannot be resolved, then Owner shall retain the disputed amount of the Payment (the "***Disputed Amount***"), then the provisions of Sections 7.5 and 7.6 shall govern the rights and obligations of the parties as to the Disputed Amount;

iii.    Inspection and approval by any lender providing financing to Owner in connection with the Project; and

iv.      Upon the submission of any Invoice, Contractor shall provide Owner with partial or final lien waivers as applicable from the Contractor or applicable subcontractors, for the Work performed and paid for pursuant to the that Invoice.

v.      Contractor shall provide Owner with updated copies of all required documents, such as contractor's license, W9, insurance certificate.

4.7. Invoices from the Contractor must be in the substantially the same format as the Sample Invoice attached hereto as **Exhibit H**.

## 5.      **Contractor's Warranty on Construction**

5.1      Contractor hereby warrants, covenants, represents and guarantees to Owner that all materials and equipment furnished under this Contract will be new and of a quality normally accepted in the trade, and that the Work will conform to all requirements of the Contract Documents.

5.2      Contractor hereby warrants and guarantees the Work against all deficiencies and defects of any type or kind whatsoever in materials, equipment, and/or workmanship and also hereby agrees to correct and/or satisfy same immediately after notice from Owner, without cost to Owner, for a period of one (1) year after Final Completion. Minor cosmetic deficiencies will only be corrected if the Owner demands correction. Contractor shall provide a certification of warranty upon Substantial Completion of the Work by Contractor and payment of the Final Payment by Owner.

## 6.      **Additional Covenants, Representations and Warranties of Contractor**

6.1      The Contractor represents and warrants that it is knowledgeable of all Legal Requirements and warrants that it shall comply with all Legal Requirements. The Contractor shall also cause all Work to be performed in accordance with all Legal Requirements. The Contractor shall obtain inspections required in connection with the construction of the Project. Should the Contractor fail to comply with such Legal Requirements, the Contractor hereby agrees to bear all resulting costs and expenses, including but not limited to the cost of any delay in accordance with the provisions of Section 2.3 above.

6.2      Contractor shall furnish in writing to the Owner the names of the persons or entities proposed for each principal portion of the Work. Contractor shall coordinate all field work and shop drawings of the various trades prior to installation of the Work, subject to the review and approval of Owner and Geotech, if applicable.

6.3      All Work shall be conducted within those permissible building areas designated by the Owner, and all materials, vehicles, equipment, machinery, supplies and debris shall be confined thereto except when not required for immediate use, whereupon the same shall be stored in the Owner-designated storage area. All heavy machinery, vehicles and equipment shall be stored overnight in said designated storage area.

Contractor's sole access to the Project shall be via routes designated by Owner's Representative from time to time. Upon completion of the Work, or any portion of the Work, Contractor shall promptly remove its equipment and materials no longer necessary to complete the Work from the Project. Throughout term of this Agreement Contractor shall keep the Project clean and reasonably free of debris at Contractor's sole cost, upon completion of the Work or termination of this Agreement, Contractor shall leave the Project free from any debris or trash at Contractor's sole cost. Owner will not be responsible for any damage, vandalism, or theft that occurs to Contractor's equipment or to any material that is stored on site.

### *JD Approved & Wetland Permits – IN PROGRESS*

6.4    The Contractor acknowledges that the Property has Wetlands. The Contractor has reviewed the Jurisdictional Delineation and the Contractor warrants that Contractor is aware of the location of all wetlands on the site. The Owner is in the progress of obtaining approval of the Wetlands Permits from USACE and DEQ. The Contractor warrants that it will conduct the Work in compliance with the terms of the Wetlands Permits once they have been issued. If the Wetlands Permit require increased construction costs or construction time that are not reasonably anticipated from **Exhibit B** or **Exhibit F**, then Contractor shall be entitled to a Change Order for such costs or time delay. The Contractor and Owner agree that the preservation of Wetlands and compliance with the Wetlands Permits is of great importance. Accordingly, the Contractor warrants the following: (i) no work will occur within one hundred feet (100') of any Wetlands unless, and until, the areas of Wetlands has been clearly and accurately identified and marked in the field, AND until the Wetlands Permits have been issued by USACE and DEQ, and (ii) the Contractor, nor any sub-contractor, shall not impact any Wetlands, whether it be temporarily or permanently unless it is specifically allowed in the Wetlands Permits. Contractor agrees that if they, or a sub-contractor, impact any Wetlands for which a permit is not issued, the Contractor shall (i) immediately report such impacts to USACE and DEQ, (ii) shall immediately take such actions to remediate or mitigate the impacts as directed by USACE and DEQ, (iii) shall pay all costs of remediation and mitigation, (iv) shall pay any monetary mitigation cost and penalties, (iv) indemnify Owner from all costs arising from such impact.

### *SWPPP & VSMP Already Approved*

6.5    The Owner has prepared a Storm Water Pollution Prevention Plan ("SWPPP") for the Project and has obtained a General Permit issued by DEQ under the Virginia Stormwater Management Program ("VSMP Permit"). The Contractor warrants that it has reviewed the SWPPP and VSMP Permit and that it is knowledgeable of the requirements set forth therein and that it will comply with all of the requirements of the SWPPP and VSMP Permit. The Owner will supply the Responsible Land Disturber under the VSMP Permit and the Owner will be responsible for ensuring that all inspections required by the SWPPP or VSMP Permit are performed. The Contractor shall perform all work required to ensure that the job site complies with the SWPPP and VSMP at all times. Contractor agrees that if they, or a sub-contractor, allow conditions to arise that

violate the SWPPP or VSMP Permit, then, the Contractor shall (i) immediately report such impacts to the County and DEQ, if so required by the SWPPP or VSMP Permit, (ii) shall immediately take such actions to remediate or mitigate the impacts as directed by the County or DEQ, (iii) shall pay all costs of compliance, (iv) shall pay any monetary mitigation cost and penalties, (iv) indemnify Owner from all costs arising from such impact.

6.6    Contractor warrants that Contractor shall not, nor shall it permit or allow any subcontractor or sub-subcontractor to, bring any Hazardous Materials (which includes petroleum products), onto the Property or the off-site rights of way and easements and shall bear all responsibility and liability for such materials; provided, however, that Contractor may bring onto the Property or the off-site rights of way and easements such Hazardous Materials as are necessary to perform the Work so long as the same is done in compliance with all Legal Requirements, and Contractor shall remain responsible and liable for all such Hazardous Materials. If Contractor or any subcontractor or sub-subcontractor encounter pre-existing Hazardous Materials at the Property or the off-site rights of way and easements, and Contractor or any subcontractor or sub-subcontractor knows or suspects that such material is Hazardous Material, Contractor and its subcontractors and sub-subcontractors shall promptly stop Work in the affected area and notify Owner. If under such circumstances Contractor or any of its subcontractors or sub-subcontractors fail to stop Work and notify Owner, Contractor shall be responsible and liable to Owner for all damages, costs, losses and expenses to the extent such failure increases the damages, costs, losses and expenses with respect to such pre-existing Hazardous Materials at the Site.

7.    **Default**

7.1 The occurrence of any of the following events shall constitute an Event of Default by Contractor and shall be deemed a material breach hereunder:

(i)    If Contractor at any time breaches, violates or defaults in the performance of any of its covenants, agreements, duties or obligations contained in this Contract and any such breach, violation or default is not commenced within forty-eight (48) hours and completed within seven (7) Days after written notice and opportunity to cure thereof is given by Owner to Contractor;

(ii)    if any requisition form, affidavit or other document submitted by Contractor to Owner or Owner's lender(s) is false or misleading in any material respect;

(iii)    if Contractor files or has filed against it a petition in bankruptcy or for reorganization or otherwise seeks relief against its creditors, or if an application is filed for the appointment of a receiver for Contractor or any of its property;

(iv)    if Contractor abandons the Project; or

(v)     if Contractor does not Substantially Complete the Work within fifteen (15) days of the Outside Completion Date applicable to either Phase.

(vi) if Contractor fails to perform Work in a safe and legal manner in accordance with all Legal Requirements.

7.2     Upon the occurrence of any Event of Default by Contractor, Owner shall have the right, in addition to (and not in lieu of) all other rights and remedies at law or in equity, to require that Contractor stop work and/or terminate this Agreement and all of Contractor's rights hereunder to enter upon the premises, and may remove and bar Contractor therefrom and take possession of and use so long as Owner desires all materials for which the contractor has received payment, or has submitted payment for on the most recent payment application request employ any other person or persons to finish the Work and provide labor and materials therefor, and do any other things to be done by Contractor hereunder and deduct the cost thereof from any money due or thereafter becoming due to Contractor. Contractor shall be entitled to payments due under this Agreement for Work already done, which work has been approved by Owner.  Contractor shall be liable to Owner for any losses, liabilities, or costs incurred by Owner by reason of Contractor's default hereunder, including all attorney's fees and costs of litigation, any and all additional carrying costs incurred by Owner as a result of Contractor's default.

7.3     The occurrence of any of the following events shall constitute an Event of Default by Owner and shall be deemed a material breach hereunder:

(i)     if Owner at any time breaches, violates or defaults in the performance of any of its covenants, agreements, duties or obligations contained in this Contract and any such breach, violation or default is not cured within ten (10) business days after written notice and opportunity to cure thereof is given by Contractor to Owner;

(ii)     if any requisition form, affidavit or other document submitted by Owner or Owner's lender(s) to Contractor is false or misleading in any material respect;

(iii)     if Owner files or has filed against it a petition in bankruptcy or for reorganization or otherwise seeks relief against its creditors, or if an application is filed for the appointment of a receiver for Owner or any of its property;

(iv)     if Owner abandons the Project.

7.4     Upon the occurrence of any Event of Default by Owner, Contractor shall have the right, in addition to (and not in lieu of) all other rights and remedies at law or in equity, to stop work and/or terminate this Agreement and all of Owner's rights hereunder. Contractor shall be entitled to all further payments under this Contract for Work already done, deposits paid, and materials already purchased and stored.

7.5     All provisions and requirements for arbitration, mediation or claim review and dispute resolution contained herein or in any other Contract document are hereby

waived and deleted and the parties shall rely solely upon the rights and remedies provided for in this instrument and at law or in equity, without resort to arbitration, mediation or non-judicial submission of claims and disputes. No such arbitration, mediation or non-judicial submission of claims and disputes shall be a condition precedent to suit or any other action by either party in any instance. Notwithstanding the existence of any controversy between Owner and Contractor hereunder, or the existence of any claim or alleged claim in favor of one against the other hereunder, Contractor shall continue the Work hereunder without interruption until ordered by Owner to cease or suspend the Work, except as otherwise defined in the agreement.

      7.6     Pending the resolution of any dispute between the Owner and the Contractor, the Contractor shall continue to perform the Work and provided the Owner shall continue to pay amounts due the Contractor that are not in dispute.

**8.**     **<u>Termination by Right</u>.** The Owner may terminate this Agreement for its convenience at any time upon providing ten (10) days written notice to the Contractor. In such case, the Contractor shall be entitled to receive as full compensation for all services performed hereunder payment for all Work performed prior to the date of termination, which work has been approved by Owner. Payment shall include all retainage withheld in accordance with Article 4. Payment of such compensation is the sole and exclusive remedy of the Contractor for termination of this Agreement by Owner hereunder and the Contractor shall not be entitled to, and hereby waives, claims for lost profits and all other damages and expenses.

**8.**     **<u>Indemnification</u>.** To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner, and any party affiliated with Owner including the Owner Representative, and any of Owner's agents, employees, or affiliated parties from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the negligent performance of the Work by Contractor, any subcontractor, guest, invitee, or party claiming through Contractor.

**9.**     **<u>Insurance</u>.**

      9.1 Contractor, before commencing Work hereunder shall affect, pay for, and keep in full force and effect during the entire term hereof, insurance issued by companies satisfactory to Owner and qualified to do business in the state where the Project is located, as follows:

          (i)     A comprehensive general or manufacturer's and Contractor's liability policy, providing coverage on an occurrence basis (if available) and including general liability, bodily injury liability, property damage and completed operations (for at least one (1) years following completion):

               Bodily Injury          $1,000,000 per occurrence

Property Damage     $ 1,000,000 per occurrence
$ 2,000,000 aggregate

(ii)     Workmen's Compensation and Occupational Disease insurance
and such other employee benefit insurance as required by the laws
of the Commonwealth of Virginia.

(iii)    Employer's liability insurance with a $ 500,000.00 limit.

(iv)     Excess Liability or umbrella Insurance with limits:

$ 1,000,000 per occurrence
$ 1,000,000 aggregate

(v)      Builder's Risk Insurance for the benefit of Owner, Contractor, any
and all of the subcontractors as their interests may appear, all of
the same to be named insureds on the said Builder's Risk policy.
The perils covered shall include fire and extended coverage, plus
other perils (including theft, vandalism and malicious mischief)
which extend coverages to the broadest form of all risk coverage.
Such coverage shall insure items of labor and materials connected
with the Work, whether in or adjacent to the structure insured,
materials in place or to be used as a part of the permanent
construction, including surplus materials, shanties, protective
fences, bridges, temporary structures, miscellaneous materials and
supplies incident to the Work, and such scaffolding, staging,
towers, forms and equipment as are not owned or rented by
Contractor, the cost of which is included in the cost of the Work.
This insurance does not cover any tools owned by mechanics,
tools, equipment, scaffolding, staging, towers and forms owned or
rented by Contractor, or cook shanties, bunk houses, or other
structures erected for housing the workmen.

9.2     Owner and Owner's Representative shall each be named as an additional
insured party under the policies called for under subparagraphs (i) of subparagraph 9.1.
If any coverage under subparagraphs (i) of subparagraph 9.1 is available only on a claim
made basis, the retroactive date of such coverage shall be no later than the earlier of the
commencement date of the Work hereunder or the date of this Contract and Contractor
also shall maintain an unlimited extended reporting endorsement with respect to claims
made for occurrences arising prior to said retroactive date.

9.3     Before commencing any Work hereunder, Contractor shall furnish to
Owner and any other person designated by Owner certificates issued by the company or
companies issuing such insurance, evidencing that such insurance is in full force and
effect; including a waiver of subrogation; and providing that no such insurance may be
cancelled without at least thirty (30) days' written notice by certified mail, return receipt

requested, to Owner (or such other person as Owner shall designate in writing to the insurer). With respect to insurance described in subparagraph (v) of this subparagraph 9.1, such insurance shall name as insured parties Contractor, Owner, Tenants and as their respective interests appear, and such certificate shall reflect the same and provide that no cancellation may occur without at least thirty (30) days' written notice by certified mail, return receipt requested, to Owner and such parties furnishing financing. At the request of Owner, Contractor also shall promptly furnish true copies of all of its said insurance policies to Owner. In addition to the foregoing, and without limitation to any other duty or obligation of Contractor set forth herein or required by the applicable law or the minimum standards of the industry in which Contractor works, Contractor shall post/construct such signs, barriers and other items in order to warn any person entering the Project, or the general public about the dangers associated therewith. This obligation shall include but not necessarily be limited to the construction of security chains, fences, and such other items to restrict unauthorized entry onto the Project during the Work and shall also include the posting of "Danger" and "Keep Out – No Trespassing" signs on the Project.

**10.    Entire Agreement**  This instrument and the items designated above as constituting a part of the Contract and the Contract Documents constitute the entire and integrated agreement existing between the parties. There are no other agreements, verbal or written relating to the Project, between the parties. This Contract supersedes any and all other agreements, Contracts and understandings, both written and oral, between the parties.

**11.    Severability**  Any provision of this Contract prohibited by law or invalid under any law shall be ineffective only to the extent of such prohibition, without in any manner invalidating or affecting the remaining provisions of this Contract, such provisions being deemed severable.

**12.    Miscellaneous**  The following terms, provisions and definitions shall apply to this Contract:

12.1    This Agreement shall be interpreted and enforced according to the laws of the Commonwealth of Virginia.

12.2    All titles and headings of sections of this Agreement are inserted for convenience only, and do not form part of the agreement or limit, expand or otherwise alter the meaning of any provisions hereunder.

12.3    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement.

12.4    The terms "hereof", "herein" and "hereunder", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular section, paragraph or provision, unless expressly so stated.

12.5    All words or terms used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other number and any other gender as the context may require.

12.6    This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such document to be drafted or prepared.

12.7    Time is of the essence for the performance and payment of each and every covenant and obligation contained herein.

12.8    No amendment of this Agreement shall be effective unless the same is made in writing and signed by the parties hereto.

12.9    The terms "person" and "persons" used herein shall include natural persons and corporations, partnerships (general and limited), firms, associations, trusts, estates, bodies politic, political subdivisions and other entities and organizations.

12.10    Each and every provision of law and governmental regulation required by law to be inserted in an Agreement such as this or in any of the Contract Documents shall be deemed to be inserted herein or therein and this Agreement shall read and shall be enforced as though so included therein, and if through mistake, inadvertence or otherwise any such provision is not inserted, or is not correctly inserted, then upon the application of either party, this Agreement shall be deemed to be amended to make such insertion or correction.

12.11    The Owner and the Contractor expressly waive any right to trial by jury in any court with respect to any contractual, tortious, statutory, or other claim, counterclaim or cross-claim against the other arising out of or connected in any way to the Project or this Agreement  because the parties hereto, each of whom represents to the other that it is represented by counsel, believe that the complex commercial and professional aspect of their dealing with one another makes a jury determination neither desirable nor appropriate.

12.12    If any term or provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable to any extent, the remainder of this Agreement or the application of this Agreement to persons or circumstances other than those against whom or which such term or provision is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permissible by law.

12.13    The following exhibits are attached hereto and are incorporated herein by reference:
Exhibit A – Property Description
Exhibit B – Proposal and Bid Documents

Exhibit C – Schedule of Values
Exhibit D – Proposal Assumptions
Exhibit E – Proposal Exclusions
Exhibit F – Plans & Specifications
Exhibit G – Work Schedule
Exhibit H – Sample Invoice
Exhibit I – Wetlands Permits

**IN WITNESS WHEREOF**, the parties have executed this Contract on the date first
above written.

OWNER:                              CONTRACTOR:

By:                                 By:

Signature_____   Signature_____

Name_____        Name___Steven J Zuchowski___

Date: _____               Date: _12/17/18_

## EXHIBIT A
## PROPERTY

The Walnut Hill Subdivision is a residential development in King George County,
Virginia that will consist of forty-two (42) single-family dwellings when complete. The
total area for the project is approximately 122.99 acres. Roads and public utilities, water
and sewer, will be public facilities maintained by Virginia Department of Transportation
and King George County. Improvements for the development will consist of, but not
limited to, completion of the development project already underway including final
clearing and grading of lots, completion of water, sanitary, and storm utilities, road
construction to intermediate paving, final grade of ditches and drainage ways, and
coordinated efforts with off-site utilities and completion of Booster Station facility
located on-site.

# EXHIBIT B
## PROPOSAL AND BID DOCUMENTS

Documents, plans, exhibits, and photos previously shared for completion purposes were included in noted DropBox location:

https://www.dropbox.com/sh/axueh052cxbbzpn/AAARMUwGUPSwqz9QlzNimo4ta?dl=0

List of items included are:

1. Booster Station (Folder)
   a. Walnut Hill new 400 amp SUBMITTALS.pdf
   b. Walnut Hill PS approval.pdf
   c. 06.13.18 Release R1 Shop Drawings Smith Midland Building.pdf
   d. 8177 EMC1A.pdf
   e. 8177 dop.doc
   f. Booster Station Seismic Design Letter.pdf
   g. 18014.Walnut Hill.Calcs.Final.Sealed.pdf
   h. 18014.WalnutHill.S1.sealed.pdf
   i. SubmittalPackage – Switchgear.pdf
   j. CYCLED-100-DYNAGEN – Lighting Fixture.pdf
   k. HUH520SA – Unit Heater.pdf
   l. LVA_Spec – 1 – Lighting Fixture.pdf
   m. Saddles 18 to 72.pdf
   n. 8177 Submittal pumps in station.pdf
   o. 028TL17VA1 Tank Shop Drawings.pdf
   p. 18-013MJ Submittal Data – generator.pdf
   q. Walnut Hills Submittal – building shell.pdf
   r. Walnut Hill Transmittal buildingshell.pdf
   s. Walnut Hill Submittal – water,sewer ipes, fittings.pdf
2. Construction Plans (Folder)
   a. Revised Grades Wildflower Way.pdf
   b. Walnut Hill.dwg
   c. WALNUT HILL.pdf
3. Control Points for Equipment GPS.pdf
4. Topo from Drone (folder)
   a. Topo 7-26-18.dwg
   b. Topo 7-26-18-Model.pdf
   c. WALNUT HILL TOPO 7-26-18.dwg
   d. WALNUT HILL Topo 7-26-18-Model.pdf

# EXHIBIT C
## SCHEDULE OF VALUES

| Item Number | Description of Work | Scheduled Value |
|---|---|---|
| 1 | Mobilization | $18,000.00 |
| 2 | Demo | $800.00 |
| 3 | Erosion Control | $105,221.00 |
| 4 | Earthmoving | $50,000.00 |
| 5 | Storm Sewer | $28,450.00 |
| 6 | Water | $41,600.00 |
| 7 | Paving | $370,026.00 |
| 8 | Misc. Conduits / Slab | $36,900.00 |
| 9 | Undercut Work for Roadways | $80,565.00 |

# EXHIBIT D
## PROPOSAL ASSUMPTIONS

Since the project was already under construction from a previous contractor and construction agreement, the following assumptions of work already completed will be as followed:

1. Utilities in place have been furnished and installed in proper conformance with industry standards and practice.
2. Structural fill material placed was done to proper conditions and specifications.
3. Existing grades are in general conformity to design and match the topography from the drone application provided.
4. Clearing limits have been completed per the designed limits of clearing.
5. Erosion and Sediment control measures have been properly designed and installed per the approved plans.
6. Stormwater Management facilities was installed per plans and approved by King George County. (Investigation of cut-off trenches and embankment composition to take place at later time.)
7. Final grading will be performed per revised construction plans by Legacy Engineering, every effort will be made to balance the job with material on-site.
8. Final pond construction will be performed per revised construction plans by Legacy Engineering.

# EXHIBIT E
## PROPOSAL EXCLUSIONS

The Work shall be as set forth in the Plans and Specifications. It is intended by the parties that **all** of the work shown on the Plans and Specifications shall be performed by the Contractor, except for the specific items listed under "Project Specific Exclusions." The items listed under "General Exclusions" are intended to cover circumstances that may arise, but are not specifically addressed by the Plans and Specifications. In case of a conflict between the Plans and Specifications and this Exhibit E, the terms of Project Specific Exclusions shall govern over the Plans and Specifications, and the terms of the Plans and Specifications shall govern over the General Exclusions. For clarification, see the following two examples:

Example 1: the Plans and Specifications show 100' of 4" conduit, and the actual field conditions require 200' of 4" conduit, and the Project Specific Exclusions state "All Conduits", then the Work shall exclude all conduits.

Example 2: the Plans and Specifications show 100' of 4" conduit, the actual field conditions require 200' of 4" conduit, and the General Exclusions state "All Conduits," then the Work shall include the 100' of 4" conduit shown on the Plans and Specifications, but shall exclude the additional 100' of conduit.

### *Project Specific Exclusions*
- Borrow pits to achieve balance or to obtain structural material needed to complete fills.
- Signage and Striping.
- Surveying and stake-out.
- Geotechnical testing.
- SWPPP Inspections, but updates to plan as required by Contractor will be performed.
- Supply of pumps, electrical equipment, and building required for Booster Station.

### *General Exclusions*
- Bonds, permits and filing fees.
- Engineering.
- Final As-builts.
- Utility Relocations.
- Clearing beyond areas shown on plans.
- Water source for Construction Entrance Wash Rack.
- Pre-blast Surveys.
- Blasting.
- Soil Manipulation (Mechanical or Chemical).
- Irrigation.
- Retaining Walls
- Buffer Fencing and Buffer Evergreens.
- Individual Lot Landscaping/Understory Trees.
- Entrance Features.

- Import Material.
- Export Material.
- Concrete Driveways.
- Sanitary Connections to Houses. Contractor to install Stubs inside the Property Line Only.  Sewer lateral shall be extended 5' beyond cleanout and marked by 2x4's. Owner shall be responsible for sewer connection from stub to inside of buildings.
- Set Water Crock, Meter Yolk, and stub as shown on the plans. Owner shall be responsible for water from meter setting to inside of buildings.
- Topsoil Screening.
- Repair to Damage By Others.
- Final VDOT/County Acceptance.

## EXHIBIT F
## PLANS & SPECIFICATIONS

Consistent with Exhibit B.

## EXHIBIT G
## SCHEDULE OF WORK

To be determined once revised plans are approved and final scope of work is delineated.

## EXHIBIT H
### SAMPLE INVOICE

Attached with breakdown included.

# EXHIBIT I
## WETLANDS PERMITS

(N/A)